## Court of Appeals.

Nov. 27, 1900.

## THE PEOPLE v. WILLIAM NEUFELD.

(165 N. Y. 43.)

1. MURDER—EVIDENCE.

Two witnesses who identified the defendant, as inquiring on the day a murder was committed, for the apartment of the deceased, testified that he then wore a dark suit of clothes, which was the color of the clothes found by the officers in defendant's home, with blood spots on them. *Held,* that it was for the jury to determine whether, in fact, the defendant did wear those clothes on the occasion of the crime or not. The absence of direct proof went to the weight to be accorded by the jury to the evidence, not to its competency.

2. SAME—CHARGE—CIRCUMSTANTIAL EVIDENCE.

Where a full clear and fair charge states correctly all the legal propositions involved in the case, the judgment will not be re-

versed on account of certain comments made by the judge on the rareness of wrongful verdicts having resulted from circumstantial evidence—especially where jury was told that the weight and character of the evidence was left absolutely to them for determination.

'APPEAL from a judgment of the supreme court, rendered at a trial term for the county of New York Dec. 29, 1899, upon a verdict convicting the defendant of murder in the first degree.

William F. Howe, for appellant.

Charles E. Le Barbier, for respondent.

CULLEN, J.—The appellant was convicted of murder in the first degree in having taken the life of one Annie Kronman on the 7th of August, 1899, and was on such conviction sentenced to death. The details of the crime, as shown by the testimony of the prosecution, for none was offered on behalf of the defense, briefly are the following: The deceased, a married woman, lived with her husband in the rear flat on the third story of No. 266 West Thirty-fifth street in New York city. The husband was in the produce commission business in Reed street. The husband and wife were the sole occupants of the flat. Mr. Kronman left his apartment for his place of business between 7 and 8 o'clock in the morning of Monday, August 7th, 1899, and returned between 6 and 7 in the evening of that day. On entering his apartment from the main hall of the building he discovered his wife, the deceased, lying unconscious on the floor. She had received several wounds in the head evidently from some sharp instrument. A hatchet lay beside her on which was apparently congealed or dry blood. The deceased's head was covered with blood and there was blood on the floor. Her husband immediately called in the other tenants and notice was given to a police officer in the vicinity. The deceased was removed in an ambulance to Roosevelt Hospital where she died that night without having regained consciousness. An autopsy disclosed that she had received seven incised wounds on the head and

face from a sharp instrument. One wound was on the left jaw extending from the corner of the mouth. The skull was fractured and the brain tissue exposed in two places. Her husband, when he first entered the apartment, found the pocket book of the deceased and a bag in which she had been in the habit of keeping her jewelry lying empty on the washstand in which they. were usually kept. He had seen his wife wear this jewelry on Sunday, the day previous. The character of the wounds showed conclusively that they were not self-inflicted. The abstraction of the jewelry indicated that theft was the motive of the crime committed. Suspicion did not attach to the defendant until some ten days later when the police officers learned that he had been seen in possession of the stolen jewelry during the preceding week, and had displayd it to many parties and had pawned or sold several pieces. Upon the discovery of these facts the defendant was arrested, indicted and put on trial.

The testimony shows that the defendant was a distant cousin of the deceased and on the " Jewish Easter " (Passover ?) in April previous to the murder he attended a small party or entertainment given by the deceased and her husband at their apartment. On this occasion the deceased wore her jewelry, and indeed two pieces of it were then given to her by her husband. This jewelry, which was recovered and produced on the trial, consisted of a diamond crescent pin, a pair of diamond earrings, a gold chain and watch, and another chain, to which was attached a gold dollar. The possession of this property by the deceased previous to the murder was proved, not only by the·testimony of the husband, but by that of three of her friends. All these witnesses identified the jewelry produced in court as being that which they had known the deceased to wear. A manufacturing jeweler was produced, who testified to the sale of the identical articles to the husband of the deceased on two occasions, and recognized his hall mark upon them. On Friday, August 11th, the de‚ fendant showed the jewelry, or pieces of it, to several wit‚

nesses in a saloon in Houston street, and endeavored to dispose of it. He sent the chain with a gold dollar attached to be pawned by one of the witnesses, and obtained five dollars thereon. On that day he pawned one of the diamond earrings with a witness, Benjamin Freedman, a pawnbroker, for $100, and at the same time told him that he had pawned the other with Simpson for $125 on the day before. On the same day he sold for $10 the pawn ticket for the earring pawned with Simpson to another witness, who, on that day, redeemed it from pawn, the defendant at the time remaining outside the pawn office. On the 16th he pawned the diamond crescent pin with another pawnbroker, also a witness, for $185. This pin he had endeavored to sell to one witness on the Wednesday after the murder. In addition, it was proved by the testimony of two witnesses who lived in the apartment house in Thirty-fifth street that on the morning of the day in which the murder was committed the defendant came to the house and inquired for the apartment of the deceased, and was directed to it. The identification of the defendant by these witnesses was positive. It was proved by a barber that a day or two after the murder the defendant had him remove the mustache which he (defendant) had previously worn. Subsequent to the arrest two police officers obtained from the place where the defendant lived with his mother a dark suit of clothes, the ownership of which the defendant admitted. A chemical analysis discovered several blood stains upon them, though whether those stains were of human blood or not the witness was unable to state because of the similarity of human blood to that of some other animals. When the defendant exhibited the jewelry in Houston street to the witnesses he stated to them that his grandmother had died and left him $15,000 and that he had bought the jewelry for his wife. There is no evidence to show that the defendant was ever married or that he had received any property from any source whatever. After his arrest he told the police officers that he had got the jewelry from a negro whom he had known

in Illinois. He stated that this negro met him on some street corner in New York and asked him to pawn the property. He also told the officers that on the morning of the day of the murder he went to a pool room in East Houston street and remained there until nine o'clock at night playing pool. No witness was produced to establish this fact nor any reason given for the failure to produce such witnesses. Such being the proof, the verdict, in our judgment, was not against the weight of evidence or against law, nor does justice require that a new trial should be had. (Code Cr. Pro. § 528.) On the contrary, we feel constrained to say that the guilt of the defendant was clearly established.

But one exception seems to have been taken on the trial. This was to the admission in evidence of the suit of clothes found at the defendant's rooms and to the testimony of the expert as to the blood stains. It is urged that there was no proof that the defendant wore this suit of clothes on the day on which the deceased was killed. It is true there was no direct evidence to that effect, but the two witnesses who identified the defendant as inquiring on that day for the apartment of the deceased testified that he then wore a dark suit of clothes. That was the color of the suit found by the officers. It was for the jury to determine whether, in fact, the defendant did wear those clothes on the occasion of the crime or not. The absence of direct proof went to the weight to be accorded by the jury to the evidence, not to its competency.

Though no exception was taken to the charge of the court, we are asked to reverse this judgment on account of certain comments made by the learned trial judge in submitting the case to the jury. The language complained of is the following: "Circumstantial evidence is just as good as any other evidence, if it satisfies the mind of the court and the jury, beyond a reasonable doubt, of the guilt of the person charged. Just as many cases, and, indeed, according to the books, more cases, of wrongful verdicts have resulted from direct evidence than from circumstantial evidence; and the notions that some

men have, in regard to the force and effect of circumstantial evidence, I have found, during nearly forty years of practice at the criminal bar of this state and upon the bench, most of those cases are found in romances and in dramas, where the writer weaves about the hero, or the heroine, a set of circumstances, having always in his mind an explanation for them, and either after they are condemned, or just before, the explanation arrives and the hero of the drama or of the novel goes off the stage in a blaze of glory." This, however, is but a single excerpt, from a full, clear and fair charge which stated correctly all the legal propositions involved in the case. The jury was instructed that the defendant could not be convicted if there was any reasonable doubt of his guilt and that " circumstantial evidence must not only point to the guilt of the person accused, but it must be absolutely inconsistent with his innocence; for if it be consistent with his innocence as a matter of course, there must arise out of the evidence a reasonable doubt as to his guilt." The jurors were further told that the weight and character of the evidence was left absolutely to them for determination and that they must not suppose that the court entertained any opinion on the subject; that if they did entertain any such supposition they must dismiss it and act for themselves; that the responsibility for the verdict was exclusively theirs and that they were to be governed by nothing that the court should say except as to the definition of the rules of law applicable to the case. In the light of the whole charge we are of opinion that the comments criticised on this appeal, even had they been made the subject of an exception, would not constitute error.

The judgment should be affirmed.

PARKER, Ch. J., GRAY, BARTLETT, MARTIN, VANN and WERNER, JJ., concur.

Judgment of conviction affirmed.