Leon B. Polsky, J.
The defendant moves to dismiss the indictment against her, claiming that the statutes upon which the charges are founded are unconstitutional. Gwivili Carter is alleged to have sold over an ounce of a substance containing methadone to an undercover officer. This alleged sale has given rise to the three charges contained in the indictment; *1082 one count relates to the alleged sale and the others to the defendant’s possession immediately prior to the sale.
Count I charges the criminal sale of a controlled substance in the first degree (Penal Law, § 220.43) and requires proof that the defendant knowingly and unlawfully sold "one or more preparations, compounds, mixtures or substances of an aggregate weight of one or more ounces containing a narcotic drug.” This offense is a class A-I felony and upon conviction the court must impose a sentence of life imprisonment (Penal Law, § 70.00, subd. 2, par. [a]) and fix a minimum period of imprisonment of not less than 15 years nor more than 25 years (Penal Law, § 70.00, subd. 3, par. [a], cl [i]).
The second count charges criminal possession of a controlled substance in the second degree (Penal Law, § 220.18, subd. 1) and requires proof that the defendant unlawfully possessed "one or more preparations, compounds, mixtures or substances of an aggregate weight of one ounce or more containing a narcotic drug”. Upon conviction for this class A-II felony, the defendant must be sentenced to life imprisonment with a minimum period of incarceration, fixed by the sentencing court, of not less than six years nor more than eight years and four months (Penal Law, § 70.00, subd. 3, par. [a], cl [ii]).
Count III charges the defendant with the class A-III felony of criminal possession of a controlled substance in the third degree (Penal Law, § 220.16, subd. 1) and requires proof that the defendant possessed any quantity of narcotic drug with intent to sell it. Upon conviction, the court must impose a life sentence and fix a minimum period of imprisonment of not less than one year nor more than eight years, four months (Penal Law, § 70.00, subd. 3, par. [a], cl [iii]).
The motion before the court is based upon two distinct claims of invalidity. First, it is contended that the use of the aggregate weight criteria in the first degree sale and second degree possession counts, as applied to diluted methadone, violates the due process and equal protection clauses of the State and Federal Constitutions; second, it is claimed that the mandatory life sentence on all the charges and the mandatory minima on the first degree sale and second degree possession charges violate the prohibitions against "cruel and unusual punishments” contained in the Eighth Amendment to the United States Constitution and section 5 of article I of the New York Constitution.
*1083 THE AGGREGATE WEIGHT CLAIM
The thrust of the defendant’s claim with respect to the use of the "aggregate weight” of the substance possessed and sold as the basis for determining the degree of offense charged in the first and second counts is that it creates irrational distinctions between similar kinds of conduct and imposes unequal punishments upon offenders who have committed virtually identical illegal acts.
At this state, it is undisputed that the defendant possessed and sold over an ounce of a mixture containing 30 milligrams of methadone in solution with over one ounce of an orange juice preparation. The defendant contends that it is unconstitutional to hold her criminally liable for the possession and sale of more than one ounce where the total controlled substance present constitutes approximately Vio of 1% of the aggregate weight of the total mixture or solution.[1]
Before proceeding to the merits of defendant’s contention, it might be helpful to trace the development of New York’s policy of basing the degree of offense upon a scale of increasing aggregate weights (or volume) of contraband substance sold or possessed.
Prior to 1950, the sale of any quantity of narcotic drug was treated as a felony and carried a sentence of up to 10 years’ imprisonment. All possessory offenses, regardless of the quantity involved, were misdemeanors, subject to a maximum sentence of one year (Penal Law of 1909, § 1751; L. 1929, ch. 377; L. 1933, ch. 684).
In 1950, section 1751 was amended to create the additional felony of possession with intent to sell and provided for the same 10-year maximum sentence as an actual sale. Built into this offense was a statutory, rebuttable presumption of intent to sell flowing from the possession of two or more ounces of heroin, cocaine or morphine of at least 3% purity or 16 ounces *1084 of cannabis or other narcotic. (L. 1950, ch. 346.)[2] In 1951, the penalty for sale and possession with intent to sell was raised to 15 years and mandatory minima sentences of two years were added to both offenses (L. 1951, ch. 529). The same Legislature, by chapter 530, also created a new felony offense based upon the possession of an aggregate weight of more than one-quarter ounce of heroin, morphine or cocaine or more than one ounce of opium or other narcotic. Conviction under the offense carried a mandatory minimum sentence of two years’ imprisonment and a permissible maximum of 10 years (Penal Law of 1909, § 1751, subd. 3; L. 1951, ch. 530). The following year, subdivision 2 of section 1751 was amended to reduce the quantity of possessed narcotics necessary to trigger the presumption of intent to sell and reduced the purity requirement for heroin, morphine and cocaine from 3% to 1% (L. 1952, ch. 414). In 1956, the penalties were again increased and the aggregate quantities of drug necessary to sustain a charge of felonious possession or to raise the presumption of intent to sell were reduced. (L. 1956, ch. 526.) Later, the Legislature eliminated the requirement that had applied only to the intent-to-sell presumption with respect to heroin, morphine and cocaine, that the aggregate weight contain at least 1% of the prohibited substance. (L. 1965, ch. 1030.)
The revised Penal Law of 1967 eliminated the weight-presumptions from the possession-with-intent-to-sell offense and contained no weight-predicated sale offense. Bare possession of more than one-eighth ounce (aggregate) of heroin, morphine or cocaine was made a class D felony (former § 220.15) and more than one ounce (aggregate) of cannabis, morphine, heroin or cocaine was made a class C felony (former § 220.20).
In 1969, the revised Penal Law was amended to create class A and class B felonies based on the sale or possession of *1085 aggregate weights of more than 16 or 8 ounces of heroin, morphine or cocaine (L. 1969, chs. 787, 788). Except for marihuana, no other drug was subject to a sale or possession offense based on weight.
Major revision of the Penal Law provisions with respect to all drugs was proposed by the Temporary State Commission to Evaluate the Drug Laws, a commission established by the Legislature and charged with the responsibility for recommending changes in law (L. 1970, ch. 474, as amd.). The commission’s proposals with respect to recodification of the Public Health Law with conforming changes in the Penal Law were enacted in 1972 (L. 1972, ch. 878). Although the commission proposals with respect to substantive changes in the penalty provisions were rejected by the Legislature (S. 9787, A. 11638/1972), the recommendations contained in the commission’s Interim Report (N. Y. Legis. Document, 1972, No. 10) provided the conceptual format for the vastly increased penalties enacted during the 1973 session of the Legislature. Under the laws enacted in 1973, the offenses with which Miss Carter is charged were made class A felonies, whereas previously the highest charge would have been a class C felony.
To some extent the challenge to the use of the aggregate weight or volume of the narcotic and the nonnarcotic diluent is similar to that made in People v Daneff (30 NY2d 793, remittitur amd 31 NY2d 667, cert den 410 US 913). (See United States ex rel. Daneff v Henderson, 501 F2d 1180.) In Daneff, it was claimed, as here, that the statutory scheme created unequal and irrational treatment of offenders by not distinguishing between possessors of like aggregate quantities of drug, where one possession might be of a relatively pure drug and the other possession could be of a far less concentrated substance.[3] However, this problem had not been overlooked by those involved in the enactment of the aggregate-weight based offenses. In District Attorney Hogan’s memorandum (supra, n 2) supporting the first New York law making use of aggregate weights, he states: "Illicit narcotics are usually impure. The preparations or compounds range from a very high to a very low narcotic content. The one-ounce quantity referred to above contemplates the lowest narcotic *1086 content likely to be found in the field of illicit drugs.” (Emphasis added.)
Twenty years later the Temporary State Drug Commission’s report (supra, p 60) again specifically deals with this problem: "Under existing law, wherever an offense is predicated upon possession or sale of a specific weight of dangerous drug, the weight is determined by the aggregate weight of any mixture or compound which contains the particular dangerous drug. Thus, for example, possession of sixteen ounces of a mixture containing both heroin and quinine is a class A felony under existing Penal Law § 220.44 regardless of whether the heroin itself forms 5% or 50% of the weight of the aggregate mixture. There is a superñcial inequity in this. However, even at 5%, (a percentage which is virtually non-existent at the 16 ounce weight), this quantity of drug is indicative of major dealership.” The commission report then discusses (pp 61-68, 87) various criteria for determining weight (or volume) related penalties, giving particular significance to the number of doses a particular quantity of drug would generate in the illicit market. Relating the doses to weight, as found by the legislative commission and interpolating the number of doses into the 1973 possessory offense under which the defendant is charged, we see that the other drugs listed in the possession in the second degree statute (Penal Law, § 220.18) are all of quantities reflecting a substantial number of doses both in aggregate and pure weights (e.g., heroin — over 400 doses; methamphetamine — 100 to 500 doses; stimulants [amphetamines] — 600 doses [at 15 mg. per dosage unit — as in benzedrine spansules]; L.S.D. — 800 doses; cocaine — over 300 doses).
Why then is Miss Carter’s possession and sale of one therapeutic dose of methadone treated as a first degree sale and second degree possession, when the specified quantities of other drugs which give rise to charges in those degrees are quantities which provide many hundreds of doses?
It appears that when the draftsmen of the 1973 amendments moved methadone into the A felony category, they were following the recommendations previously made by the Temporary State Drug Commission which had urged that all narcotics be made subject to the A and B felony aggregate weight provisions then existing for heroin, morphine and cocaine. ( N. Y. Legis. Doc., 1972, No. 10, p 67.) The commission based the recommendation upon its finding that possession of these higher weights of methadone and other narcotics, *1087 such as Demerol or Dilaudid was indicative of major dealership. This finding related to methadone as it was then dispensed for out-patient use by the State-sponsored clinics in New York. At that time, however, methadone was not dispensed or prescribed for out-of-clinic consumption in a liquid formulation. Indeed, it was not until several months after the passage of the challenged statutes that methadone began to be distributed in New York in liquid form.
The defendant has submitted the affidavit of Dr. Robert Newman, an Assistant Commissioner in the New York City Department of Health, and Director of the New York Methadone Maintenance Treatment Program since 1970. The People have conceded Dr. Newman’s expertise. Dr. Newman states, and the court finds: that during 1972, governmental operated clinics and most private clinics were dispensing methadone for out-patient use in solid tablet form (called "diskets”); that on December 15, 1972, there was published in the Federal Register (vol. 37, no. 242) a proposed regulation of the Federal Food and Drug Administration, effective March 15, 1973, requiring that methadone be dispensed in a liquid formulation (37 F Reg 26,804); that after publication, largely because of objections made by Dr. Newman’s agency, the Federal Drug Administration (F.D.A.) considered requests to withdraw the requirements of dilution of dispensed methadone and considered requests to grant New York an exemption from the requirement. It was not until July 6, 1973 that these requests were formally rejected by the F.D.A. and another several months before the drug programs were able to comply with thé direction to dispense take-home doses of methadone in liquid solution.
All of these factors, together with the absence of any specific reference to methadone weights in the available debates, reports and memoranda connected with the enactment in the spring of 1973 of the challenged statutes, point clearly to the conclusion that methadone was included in the aggregate weight-based first and second degree offenses because of a lack of awareness of the then pending change in the method of dispensing the drug.
This conclusion may explain why Miss Carter’s possession and sale are treated as A-II and A-I felonies under the statutes. However, it does not directly affect the legal principles applicable to her constitutional challenge. What the Legislature may have known, or be presumed to have known *1088 when passing a law, certainly is relevant to the resolution of ambiguities or problems in the construction of a statute. It is not directly relevant to the question of whether there is a rational basis for the classification drawn by the Legislature. Whether there is a rational basis must be decided on the facts as they are, not as they may have been or were thought to be. (Municipal Gas Co. v Public Serv. Comm., 225 NY 89, 95-96.)
I can conceive of no rational basis for a law which treats 30 milligrams of therapeutic methadone (plus a few grains of filler and binder) to which a clinic employee has added an ounce or so of liquid, with the same degree of criminality and sanction as the same weight of more potent, illicit narcotics possessed or sold in dosage quantities at least one hundred times as great.
Insofar as section 220.43 and subdivision 1 of section 220.18 of the Penal Law treat the sale and possession of methadone in an aggregate weight of one ounce or more as class A-I and A-II felonies, respectively, the statutes are unconstitutional and violative of the due process and equal protection clauses in the New York and United States Constitutions. Therefore, the defendant’s motion to dismiss the first and second counts of the indictment is granted (CPL 210.20, subd. 1, par. [h]).
CRUEL AND UNUSUAL PUNISHMENTS
The remaining charge, criminal possession of a controlled substance in the third degree is based upon the defendant’s possession of the methadone with intent to sell. (Penal Law, § 220.16.) Under subdivision 1 of this section, the possession of any quantity of any narcotic with intent to sell it is proscribed and punished as a class A-III felony. (The other subdivisions in section 220.16 deal with the bare possession of specified large quantities of nonnarcotic controlled substances.)
Since this charge is not predicated upon any particular weight of methadone, it is not subject to the objections discussed above. Neither is the charge subject to a constitutional objection based upon its classification as a narcotic drug. Although methadone, in the Federally required formulation, could perhaps more appropriately have been treated by the Legislature as a "narcotic preparation” (see Penal Law, § 220.00, subd. 8), as discussed below, there is nothing unreasonable or irrational in the classification of methadone as a "narcotic drug” together with other substances listed in Public *1089 Health Law schedules I and II. (See Penal Law, § 220.00, subd. 7; Public Health Law, § 3306.)
Accordingly, the court is bound by the decisions in People v Broadie (45 AD2d 649 [2d Dept., 1974]) and People v Venable (46 AD2d 73 [3d Dept., 1974]), disallowing similar challenges to the penalty provisions of the 1973 drug laws. (See, also, People v Montane, 46 AD2d 617 [1st Dept., 1974].)
OTHER CONSIDERATIONS
In dismissing Counts I and II, it was noted that contemporaneous with the Legislature’s consideration of the bills which resulted in the present law, the Food and Drug Administration was imposing requirements which drastically altered the formulation of therapeutic methadone. Not only does the now required dilution affect the aggregate weight of the program-dispensed methadone, but it gives rise to a legitimate argument that the methadone so diluted should not be considered as a "narcotic drug” under subdivision 7 of section 220.00 of the Penal Law but rather should be treated for penal purposes as a "narcotic preparation” under subdivision 8 of section 220.00.
The drugs which are classified as "narcotic preparations” are subject to a maximum class C felony charge for possession (Penal Law, § 220.09, subd. 3) or sale (Penal Law, § 220.34, subd. 1, par. [a]). A second similar offense increases the grade of offense to a class B felony (Penal Law, §§ 220.12, 220.37, subd. 2).
The controlled substances presently subject to the narcotic preparation classification are those in schedules 111(b) and III(c) of article 33 of the Public Health Law and include Nalorphine (a narcotic antagonist used in the treatment of addicts) and therapeutic formulations of codeine, morphine, opium, ethylmorphine, dyhydrocodeine, and dehydrocodeinone.
While the similarities and dissimilarities in chemical properties among the narcotic drugs, narcotic preparations and methadone are significant to the ultimate legislative decision as to how diluted methadone should be classified, counsel points to other factors which warrant consideration. Of particular significance is the fact that almost all of the pending methadone sale cases involve former heroin addicts who have sold a portion of their take-home supply and "stretched” the *1090 balance to cover their own needs. Thus, the seller of his own clinic-supplied methadone is limited, at the maximum to two or three $10 sales a week. The person selling illicitly acquired drugs, on the other hand, suffers from no such restriction. Thus, it reasonably can be predicted that the person who is caught selling $10 worth of heroin or cocaine has access to more drugs, and thereby poses a greater threat to the community.
Additionally, it should not pass unnoticed that the persons selling part of their program-supplied methadone are addicts who are making an effort to overcome their addiction. That some should falter by selling a few dollars worth of their State-supplied medication to an undercover officer posing as an addict is unremarkable and suggests a need for understanding and compassion greater than the mandatory life imprisonment required by the statute. However these are arguments which should be advanced to the Legislature, not the courts.
ORDER
For the foregoing reasons, it is ordered that,
Count I, charging criminal sale of a controlled substance in the first degree, be and the same hereby is dismissed, with leave to resubmit as criminal sale of a controlled substance in the third degree or a lesser included offense thereof;
Count II, charging criminal possession of a controlled substance in the second degree, be and the same hereby is dismissed, with leave to resubmit as criminal possession of a controlled substance in the seventh degree (Penal Law, § 220.03);
The motion to dismiss Count III, charging criminal possession of a controlled substance in the third degree, is denied.

. It should be noted that the percentage (0.1%) is based upon defendant’s assumption that the one ounce alleged in the indictment is one ounce (or 28,350 mg.) avoirdupois weight. However, it is clear that the proof must establish one fluid ounce, a measure of volume rather than the avoirdupois ounce which is a measure of weight. (See Penal Law, § 220.00, subd. 3.) Technically then, the challenge here is to the use of the aggregate volume of the material sold or possessed rather than its aggregate weight. None of the legal principles involved are affected by this; however, the percentage of methadone (by weight or volume) would, in a nonsignificant way, vary from the 0.1% alleged by counsel.

. This amendment, establishing what appears to be the first weight-related drug offense in the United States, had been proposed by the New York County District Attorney’s office. The memorandum in support of the change submitted by District Attorney Hogan, after noting the arbitrariness of treating as misdemeanors the possession of large quantities of narcotic drugs, urges the presumption of intent to sell based upon the possession of "a quantity of narcotic drugs so large as to materially exceed the amount at all likely to be possessed by a drug addict”. (Quoted in N. Y. Legis. Document, 1971, No. 8, p 41.)
Subsequent amendments, as indicated in the text, not only lowered the weights originally used to create the presumption of intent to sell, but also created independent possessory felonies based solely on weight.

. Neither this case nor Daneff presents a situation where the quantity of drug is so diluted with a nonnarcotic agent that the aggregate substance may lose its character as a narcotic.